# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
Executive Director
and Attorney-in-Chief

Southern District of New York
Jennifer L. Brown
Attorney-in-Charge

August 8, 2023

**BY ECF AND EMAIL**
Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

     **Re:   United States v. Malvin Restituyo,**
        **22 Cr. 192 (JSR)**

Dear Judge Rakoff:

Malvin Restituyo is a 34-year-old man with no criminal history before this case. Rather than leading a life of crime, Mr. Restituyo has always worked at simple, lawful jobs since he was a child. He is severely cognitively impaired, with a Full Scale IQ of 69, and is all-but illiterate. See **Exhibit A** (Psychological Evaluation Report). He is so impaired that Magistrate Judge Moses referred his November 3, 2022 guilty plea back to Your Honor given her concerns about his competence.

Mr. Restituyo was never a member of the violent street gang known as the "Shooting Boys," as the government has conceded. The government refers to Mr. Restituyo as an "associate" of the gang; it would be more accurate to say that the gang members took advantage of Mr. Restituyo's cognitive and emotional vulnerabilities and used him for their own ends. Specifically, they used him for his ability to repair stolen motorbikes and his access to the basement of the building from which he made deliveries. They called him "Puto," a vulgar slur connoting weakness.

Mr. Restituyo pleaded guilty to transferring ammunition to a prohibited person, in violation of 18 U.S.C. § 922(d)(3), accepting responsibility for allowing the Shooting Boys to keep a gun in the basement and giving it to Andrew Done, a.k.a. "Caballo," at his request so that he could shoot at members of a rival gang on June 23, 2019. Mr. Restituyo regrets his conduct and recognizes its seriousness. He also apologies for absconding from home incarceration prior to sentencing.

Honorable Jed S. Rakoff                                                August 8, 2023
United States District Judge                                            Page 2 of 9

Sentencing is set for August 15, 2023, at 4:00 p.m.  Weighing the nature and circumstances of Mr. Restituyo's offense and his mitigating personal history and characteristics, the Court should impose a custodial sentence of substantially less than the 42 months it imposed on codefendant Joseph Rivera.

## BACKGROUND

### Early Childhood

Now 34 years old, Mr. Restituyo was born in the Dominican Republic in 1989.  His parents were both hardworking—his father was a taxi driver who left for the United States when Mr. Restituyo was young; his mother worked as a live-in housekeeper—but they were very poor.  The house where Mr. Restituyo spent most of the first ten years of his life, in the care of his grandparents, had an earth floor, a leaky tin room, and no running water.  Both the latrine and the "kitchen" were outside; they cooked over an open flame.  Mr. Restituyo's only pair of shoes was an old set of flip-flops.

### Cognitive Impairment

Mr. Restituyo's cognitive problems were evident from an early age.  He started school late—entering first grade only at age 10 or 11—and struggled to keep up.  "I worried about Malvin because he had a lot of trouble reading and writing," writes Mr. Restituyo's father, Feliz Pereyra Monegro.  **Exhibit B**.  "I suspect his learning difficulties have something to do with his childhood, because he fell ill with meningitis right after his birth.  He barely survived."  Id.  He was bullied by the younger children in school for his age and his poor comprehension, and he dropped out after primary school to work full time.  Mr. Restituyo reads Spanish very poorly and can barely sign his own name.

Dr. Liliana Rusansky Drob, Psy. D., conducted a thorough evaluation of Mr. Restituyo and determined that, while he is legally competent, "his overall IQ is in the deficit range and his overall intellectual functioning is estimated to be no higher than the borderline range." Ex. A at 13  His Weschler Adult Intelligence Scale ("WAIS-IV") Full Scale IQ score of 69 places him in the bottom 2 percentile of verbal comprehension functioning, id. at 8, while his processing speed index ("PSI") and Repeatable Battery of the Assessment of Neuropsychological Status Update ("RBANS") both put his cognitive skills in bottom 0.1 percentile, id. at 9–10.  His memory in particular was found to be in the "extreme deficit range," even as he put forth maximal effort, passing a memory malingering test with flying colors.  Id. at 11–12.

Honorable Jed S. Rakoff                                    August 8, 2023
United States District Judge                               Page 3 of 9

Mr. Restituyo's limited premorbid functioning was further impaired by head trauma.  In particular, he was shot in the head as a teenager in the Dominican Republic and he was the victim of a November 2019 car-on-motorbike collision in which he sustained a skull fracture.  Id. at 4–5.  Mr. Restituyo now suffers from "extreme deficits in cognitive processing speed and memory, deficits that are typical of individuals who have suffered brain injuries."  Id. at 14.

## Work Ethic

Mr. Restituyo's other defining characteristic is his strong work ethic, which also manifested itself since childhood.  "Although he was not an exemplary student, Malvin has always been a hard worker."  Ex. B; see also **Exhibit C** at 1 (Letter of Ismael Pereyra Restituyo) ("Malvin has always been a hard worker.").  Mr. Restituyo began working in the streets as a shoe-shiner and fruit seller from age 7.  His earnings went to help the family, but he was permitted to keep some of it, which he saved up for a bicycle.  He later became interested in motorbikes and developed rudimentary skills as a mechanic.

Mr. Restituyo immigrated to the United States at age 21, having obtained a green card through his father.  He worked from the moment he arrived.  "[I]t's very difficult to get a job in this country without being able to read and write very well.  But he was trying to do the best he could.  He worked as a painter for contractors and was also employed as a delivery man for a woman who had a catering business."  Ex. C at 1.

For 10 years or more, up until his arrest on March 31, 2020, Mr. Restituyo worked delivering food prepared by a Dominican woman named Mangu who ran a catering business out of her apartment on 176th Street, in the Bronx.[1]  He worked 10 a.m. to 4:00 p.m., six days per week, and often stayed late to help Mangu clean the kitchen.  Mangu found Mr. Restituyo to be a great worker, reliable, trustworthy, hardworking, and humble, and she would have continued to employ him after his arrest had his home incarceration not prevented it.  Through his work doing deliveries for Mangu, Mr. Restitution became acquainted with Rene, the superintendent of Mangu's building, who was impressed by Mr. Restituyo's good manners and work ethic.  The superintendent gave Mr. Restituyo a key to the basement of the building so that he could store his delivery motorbike there and use the space to fix other motorbikes.

---

[1] Undersigned counsel and a defense investigator went to the location on August 9, 2022 and met with both Mangu and the building superintendent, Rene.

Honorable Jed S. Rakoff                                          August 8, 2023
United States District Judge                                     Page 4 of 9

## Offense Conduct

Meanwhile, Mr. Restituyo had become acquainted with some of his codefendants in this case, a group of young Dominican men who called themselves the "Shooting Boys," and he began dating Paola Almonte, the sister of his codefendant Victor Almonte.  The Shooting Boys began to use Mr. Restituyo for his skill as a mechanic and his access to the basement of the building on 176th Street.  They had him fix up motorbikes that they stole— since a common method of theft damages the bike when breaking the locking mechanism—and they stored their bikes and a gun in the 176th Street Basement.[2]  They looked down on him and called him "Puto," a term of abuse for a weak or effeminate man.

Mr. Restituyo has pleaded guilty to transferring ammunition to a prohibited person, in violation of § 922(d)(3), for retrieving Done's gun from the basement for him and accompanying him and others as Done shot at members of a rival gang.  The parties have stipulated that the guideline for aiding and abetting attempted murder is applicable, leading to a guidelines range near the 10-year statutory maximum for Mr. Restituyo's offense of conviction.  The PSR notes that Done's shooting conduct that day resulted in a state conviction for assault in the second degree and a five-year probationary sentence.  See PSR ¶ 23.

## Psychological Issues

As Dr. Drob explains in her report, beyond his substantial cognitive deficits, Mr. Restituyo suffers from "a range of emotional and adaptive problems and deficits, including clinically significant anxiety, and problems in information processing, reality testing, social perception, and emotional regulation that have impacted negatively Mr. Restituyo's capacity to make a satisfactory adjustment to adult life and impaired his judgment and decision-making."  Ex. A at 13.  The result of his "lack[ of] capacity to function adequately without considerable supervision and support" is that "he has developed an inordinate dependency on others, making him subject to their guidance and influence, which in a negative social environment appears to have had highly maladaptive consequences."  Id. at 14.

In other words, Mr. Restituyo is especially "vulnerable to being readily influenced and even exploited by those around him."  Id.  That is exactly what happened when the Shooting Boys took advantage of him to pull him into illegal conduct when he had a remunerative job and a clean record.  As

---

[2] The government alleges that Mr. Restituyo participated in two robberies of electronic bicycles.  See PSR ¶ 26.  While Mr. Restituyo recalls being present for motorbike theft, he never used force against another person.

Honorable Jed S. Rakoff                                    August 8, 2023
United States District Judge                                Page 5 of 9

his sister writes, "Malvin always had good intentions, but what happened was that bad people took advantage and my brother did not understand the consequences of aiding criminal behavior." **Exhibit D** (Letter of Ruth Perira Restituyo Lopez); <u>see also</u> Ex. C at 1 ("I think that he has always been easily influenced and sometimes he doesn't know when someone has bad intentions.").



## **Home Incarceration**

After his March 31, 2022 arrest, Mr. Restituyo was placed on home incarceration in the apartment of the mother of his girlfriend, Paola Almonte,

Honorable Jed S. Rakoff                                      August 8, 2023
United States District Judge                                 Page 6 of 9

the sister of Mr. Restituyo's detained codefendant, Victor Almonte.  The situation was understandably fraught.  "Because he couldn't continue working his old job doing deliveries, she would get angry with him because he was always home and didn't help with household expenses.  She would order him to leave the house and work, even though he wasn't allowed to.  It was a difficult and hard situation for Malvin.  On one occasion, she threw a glass at him because she was so angry."  Ex. B at 1–2.

The loss of work to home incarceration was also devasting for Mr. Restituyo, who had worked all his life; work supported his fragile sense of self worth.  As Dr. Drob noted in her September 27, 2022 report, "He would like to be allowed to work so that he can feel good again."  Ex. A at 6.  She also noted, in connection with his attention deficit, "He feels that he has no tolerance to spend long periods seated or occupied in a repetitive task without being mobile."  Id. at 11.

Over the months of home incarceration, Mr. Restituyo fell into a deep depression, which Dr. Drob captured in her report.  She wrote:

> Currently Mr. Restituyo is suffering from, and requires treatment for clinically significant symptoms of depression and anxiety . . . He currently expresses concerns and anxiety related to his court case, his fears that others will target him, his alienation from his girlfriend and her family, his inability to engage in gainful employment and the restrictions placed upon him by the court. . . . A referral to counseling and a psychiatric evaluation for possible psychopharmacological intervention is indicated.

Id. at 15–16.  Accordingly, I requested that mental health treatment be added as a bail condition, and the Court granted that request on September 30, 2022.  Unfortunately, Mr. Restituyo was not placed in treatment for some time, and his admission was further delayed when he contracted COVID.  He had still not received treatment when he absconded from supervision around December 29, 2022, after nine months of home incarceration.

There is no excuse for Mr. Restituyo's failure to report to Pretrial between December 29, 2022, and his apprehension on June 11, 2023.  But it is mitigated by his untreated mental illness and impossible living situation.  He was homeless for five months, working deliveries with a motorbike that a friend loaned him.[3]  "He was under so much pressure and stress.  When he

---

[3] The government has stated that the motorbike was stolen, but Mr. Restituyo was not charged in the state with possession of stolen property.  He pleaded guilty to a disorderly conduct violation and received a conditional discharge.

Honorable Jed S. Rakoff                                             August 8, 2023
United States District Judge                                          Page 7 of 9

disappeared, no one knew where he went.  We were so worried.  Malvin understands know that his decision was a huge mistake." Ex. C at 2.

* * * * *

Now Mr. Restituyo is incarcerated—for the first time in his life—and he is depressed and ashamed of his conduct.  His brother writes:  "When I go to visit him now in the jail, he tells me that he wants to apologize to everyone, and that he wants to make up for his mistakes and be a different man going forward.  He wants to work, like he always has . . . . Id. at 2.

**DISCUSSION**

"In deciding what sentence will be 'sufficient, but not greater than necessary' to further the goals of punishment, 18 U.S.C. § 3553(a), a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain."  United States v. Singh, 877 F.3d 107, 121 (2d Cir. 2017) (second internal quotation marks omitted).

The nature and circumstances of Mr. Restituyo's offense are strongly mitigated by his positive personal history and characteristics.  Most salient are his good character, lack of prior criminal convictions, and work ethic, as well as the cognitive limitations and psychological conditions that made him vulnerable to exploitation by the Shooting Boys.

The Court is by now very familiar with the Shootings Boys, as several defendants have already appeared for sentencing.  Among the sentenced defendants, Mr. Restituyo is most similar to Joseph Rivera, whom the Court sentenced to 42 months of imprisonment.  According to the government's sentencing memorandum in Rivera's case (ECF Entry 120), Rivera distributed narcotics for at least four years, selling up to $10,000 worth of cocaine per day.  Rivera carried a firearm while he sold drugs and stored additional firearms for the Shooting Boys.

Messrs. Restituyo and Rivera are similarly situated in several respects.  The government has labeled them both as "associates," rather than "members," of the Shooting Boys.  Both stored guns for the Shooting Boys. And both absconded from home incarceration, though Rivera disappeared under more aggravating circumstances, having been remanded for bail violations but granted 24 hours to set up care for his mother.

Yet several important mitigating factors distinguish Mr. Restitutyo and indicate that a sentence of substantially less than 42 months is sufficient in his case.

Honorable Jed S. Rakoff August 8, 2023
United States District Judge Page 8 of 9

First, Mr. Restituyo's lack of other criminal convictions sets his case apart and informs each of the purposes of sentencing under § 3553(a)(2).[4] The Second Circuit has recognized that less time is necessary to punish and specifically deter a defendant who has not previously been imprisoned. See United States v. Mishoe, 241 F.3d 214, 220 (2d Cir. 2001). Indeed, a first felony conviction, with its attendant collateral consequences, is a significant sanction in its own right. See generally United States v. Nesbeth, 188 F. Supp.3d 179, 182 (E.D.N.Y. 2016) ("Today, the collateral consequences of a felony conviction form a new civil death. Convicted felons now suffer restrictions in broad ranging aspects of life that touch upon economic, political, and social rights."). By the same token, that Mr. Restituyo's history is one of lawful employment rather than criminal involvement indicates that he can be rehabilitated rather than incapacitated.

Second, "Mr. Restituyo suffers from both significant cognitive and emotional deficits," Ex. A at 13, which made him vulnerable to exploitation by the Shooting Boys. Cognitively impaired individuals "do not act with the level of moral culpability that characterizes the most serious adult criminal conduct." Akins v. Virginia, 526 U.S. 304, 306 (2002) (precluding the execution of the "mentally retarded"); see also id. at 308 n.3 (noting that the upper bound for "'mild' mental retardation" is an IQ of approximately 70). Leniency is appropriate when sentencing such individuals because "two of the primary rationales for punishing an individual by incarceration—desert and deterrence—lose some of their relevance when applied to those with reduced mental capacity." United States v. Chatman, 986 F.2d 1446, 1452 (D.C. Cir. 1993). Mr. Restituyo's cognitive and emotional deficits not only contextualize and mitigate his offense; they also make him especially vulnerable to abuse and other difficulties in prison—and he is very vulnerable in any event, given the history. On the other hand, in conjunction with Mr. Restituyo's positive character, they point the way forward: Mr. Restituyo can succeed in society if he receives the "considerable supervision and support," Ex. A at 14, including psychological treatment, that the Probation Department can provide him on supervised release.

Finally, the Court should credit the nine months that Mr. Restituyo spent on home incarceration prior to absconding.[5] Home detention is such a significant restriction on a person's liberty that both Congress and the Sentencing Commission have equated it with imprisonment. See 18 U.S.C. § 3563(b)(19) (home detention may be imposed as a condition of probation "only as an alternative to incarceration"); U.S.S.G. § 5C1.1(e)(3) ("Schedule of

---

[4] By contrast, Joseph Rivera had 32 prior convictions, four felonies and 28 misdemeanors.

[5] By contrast, Rivera spent only approximately one month on home incarceration and failed to comply with it during that month.

Honorable Jed S. Rakoff                                                    August 8, 2023
United States District Judge                                              Page 9 of 9

Substitute Punishments") (if giving a non-incarceratory sentence, one day of home detention is equal to one day of imprisonment); § 5F1.2 ("Home detention may be imposed as a condition of probation or supervised release, but only as a substitute for imprisonment.").  Although federal defendants do not receive credit from the BOP for time spent on home detention, credit is the norm in several states. See Kate Weisburd, *Punitive Surveillance*, 108 Va. L. Rev. 147, 181 & n.211 (2022) (collecting cases).  Home *incarceration*—the condition set for Mr. Restituyo—was an even greater restriction on his liberty because it did not allow him to work.  Nine months of home incarceration in a small apartment (and under constant verbal abuse) was a significant punishment that should receive judicial consideration notwithstanding Mr. Restitution's ultimate failure to comply.

## CONCLUSION

The Court should impose a sentence of substantially less than 42 months.

                                                    Respectfully submitted,

                                                    /s/
                                                    Clay H. Kaminsky
                                                    Assistant Federal Defender
                                                    Federal Defenders of New York
                                                    (212) 417-8749

Cc:    AUSA Dominic Gentile

# EXHIBIT A
*Redacted*

# EXHIBIT B

Hon. Jed S. Rakoff
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Distinguished Judge,

My name is Feliz Pereyra Monegro. With the help of my son Ismael, I am writing this letter of support for my youngest son, Malvin Pereyra Restituyo.

As Malvin's father, I always wanted to give him a good education, and I tried to lead him on the right path. I advised him and told him to go to school today so that tomorrow he could have opportunities in life. Two of my children had a difficult childhood that they went through in our country. When they were younger, I left to Puerto Rico to look for a better future for my children and I left them with their mother. Their mother was in an unbearable financial situation, so she left Malvin to his grandmother. His grandma raised him until he was 8 years old.

When I returned to the country, I dedicated myself to spending time with my children. I worried about Malvin because he had a lot of trouble reading and writing. I suspect his learning difficulties have something to do with his childhood, because he fell ill with meningitis right after his birth. He barely survived. If it wasn't that, it could have been the accidents he suffered in his youth, like when he fell from the third floor of a staircase when he lived with his grandmother.

Although he was not an exemplary student, Malvin has always been a hard worker. Since he was little, he has always liked working in many different areas. As a boy, he sold flowers and fruit and washed shoes. Later, he worked in construction, doing delivery, whatever there was for work. He also knows how to repair engines.

Above all, family is what matters to Malvin. He has a caring personality. He loves children, he never disrespects his parents, and he likes to help older people. He is a good son. As a father I have suffered a lot from what has happened. Malvin has never been incarcerated in his life, and that is why it hurts me more to see him in jail.

I would like you to give Malvin a chance to make things better. He has a son who he wants to be with to raise him and show him how to be an honorable man. I know that he will do better in the future. When I went to the jail to visit him, he told me that from now on he is going to do everything he can to improve himself. I believe that he tells me the truth because I see it in his eyes. I believe in Malvin. I hope to God that everything turns out well in the end.

Sinceramente,
Feliz Pereyra Monegro

Hon. Jed S. Rakoff
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Distinguido Juez,

Mi nombre es Feliz Pereyra Monegro. Con la ayuda de mi hijo Ismael, le escribo esta carta de apoyo para mi hijo menor, Malvin Pereyra Restituyo.

Yo como padre de Malvin siempre le quise dar una buena educación, y trataba de llevarlo por el camino correcto. Yo le aconsejaba y le decía que fuera a la escuela para que en la mañana pudiera tener oportunidades en la vida. Dos de los hijos mío tuvieron una infancia difícil qué estaban atravesando en nuestro país. Cuando ellos estaban más chiquitos yo tuve que emigrar a Puerto Rico para buscar buen porvenir para mis hijos y se lo dejé a la madre. Su madre tenía una situación económica insoportable y ella se lo dejó a la abuela. La abuela lo crio hasta los 8 años.

Cuando yo regresé al país, me dediqué a estar con mis hijos. Me preocupé por su estudio porque Malvin tuvo problemas con la lectura y la escritura. Sospecho que sus dificultades tienen algo que ver que su infancia, porque se cayó enferma con meningitis justo después de su nacimiento. Apenas la sobrevivió. Si no fue eso, pudiera ser los accidentes que sufrió en su juventud, como cuando él se cayó del tercer piso de una escalera cuando vivía con la abuela.

A pesar de que no fuera un estudiante ejemplar, Malvin siempre ha sido bien trabajador. Desde chiquito siempre le ha gustado trabajar en muchas áreas diferentes. Como hijo, vendía flores y fruta y lavaba zapatos. Después, trabajaba en construcción, haciendo delivery, lo que fuera para trabajo. Él también sabe reparar motores.

Sobre todo, la familia es la que le importa a Malvin. Tiene una personalidad cariñosa.  A él le gustan mucho los niños, nunca le falta de respeto con sus padres, y le gusta ayudar a las personas mayores de edad. Es un buen hijo. Yo como padre he sufrido mucho por lo que haya pasado. Malvin nunca ha caído preso en su vida, y por eso me duele más verle en una cárcel.

Yo quisiera que le dé una oportunidad para que Malvin haga las cosas mejor. Él tiene un hijo con quien quiere estar para criarle y mostrarle como ser un hombre honorable. Yo sé que él va a hacer la cosa mejor en el futuro. Cuando fui a la cárcel para visitarlo, él me dijo que de ahora en adelante va a hacer todo lo que pueda para mejorarse. Creo que me diga la verdad porque lo veo en sus ojos. Yo tengo confianza en Malvin. Espero en Dios que todo salga bien al final.

Sinceramente,
Feliz Pereyra Monegro

# EXHIBIT C

August 2, 2023

Hon. Jed S. Rakoff
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Distinguished Judge,

My name is **Ismael Pereyra Restituyo.** I write to you with a letter of support for my younger brother, Malvin Pereyra Restituyo. It's true that Malvin has made mistakes. But I want to tell you that Malvin is a good brother and a good person. He has faced many challenges in his life, and I believe that he has learned from his bad decisions.

I am two years older than Malvin, so our childhoods in the Dominican Republic were similar at the beginning. We were very poor. In that time, my father was living in Puerto Rico, so it was just our mother and us at home. It was difficult for her to support us as a single mother. She worked cleaning houses but did not make enough money. Because of that, we needed to work beginning when we were 7 years old. We washed shoes and sold fruit at busy intersections. Because we had to work, we could not attend school every day because we needed to help with household expenses.

I was a good student, but Malvin never liked school. He has always had learning difficulties. Because of that school didn't interest him. When we got older, our mother could no longer support us and our younger sisters, so Malvin and I needed to move out. Fortunately, my mother found a Catholic boarding school at which I could continue my education with the nuns. But the school could only accommodate one more student, so my mother had to make the difficult decision to choose which of her boys would be able to continue his schooling. Because Malvin always struggled at school, she chose me. Malvin went to live with our grandmother and had to continue working.

After the fourth grade, Malvin never went back to school. He should have continued with his education the best he could, but he needed more supervision. He preferred to spend his time off with his friends, who weren't always positive influences. It's important to note that when he was a boy, Malvin had several accidents in which he suffered blows to the head. I think that he has always been easily influenced and sometimes he doesn't know when someone has bad intentions. Unfortunately, he still had that problem when he got older.

Malvin has always been a hard worker. The reality is that it's very difficult to get a job in this country without being able to read and write very well. But he was trying to do the best he could. He worked as a painter for contractors and was also employed as a delivery man for a woman who had a catering business. But he was exhausted of never being able to find a steady job. I think that's why Malvin did what he did. It's not an excuse, but it seems to me that people took advantage of him because he couldn't see that they were using him and that he didn't matter to them.

When Malvin was being supervised, he was living in the home of his girlfriend's mother. But because he couldn't continue working his old job doing deliveries, she would get angry with him because he was always home and didn't help with household expenses. She would order him to leave the house and work, even though he wasn't allowed to. It was a difficult and hard situation for Malvin. On one

occasion, she threw a glass at him because she was so angry. Once, Malvin told me he would rather live on the street than continue living there. I told him he should talk to his officer or his lawyer, but I don't know if he did that or not. He was under so much pressure and stress. When he disappeared, no one knew where he went. We were so worried. Malvin understands know that his decision was a huge mistake.

My brother is very ashamed of the mistakes he has made. When I go to visit him now in the jail, he tells me that he wants to apologize to everyone, and that he wants to make up for his mistakes and be a different man going forward. He wants to work, like he always has, and keep on moving forward in life, for his son especially. I work in construction myself. I do flooring, plumbing, carpentry, and more. For years now, I have been saving up the money to open my own contracting business. I have almost all the tools I need, I just need to save a bit more to buy a work van. Malvin tells me that whenever he is released, he wants to work with me. With a little luck I will have my business open by then.

Malvin has suffered a lot in his life and he hasn't had good friends to help him stay on a good path. But I think that this case, and above all his time incarcerated, has been eye-opening for him. Malvin would never harm anyone. All I hope is that you give him another opportunity.  Thank you for your time.

**Sinceramente,**
**Ismael Pereyra Restituyo**

2 de agosto de 2023

Hon. Jed S. Rakoff
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Distinguido Juez,

Mi nombre es **Ismael Pereyra Restituyo**. Le escribo con una carta de apoyo para mi hermano menor, Malvin Pereyra Restituyo. Es cierto que Malvin ha cometido errores. Pero quiero decirle que Malvin es un buen hermano y una buena persona. Él ha enfrentado muchas dificultades en su vida, pero yo pienso que él ha aprendido de sus equivocaciones.

Soy dos años mayor que él, así que nuestras juventudes en la República Dominicana eran similares al principio. Éramos muy pobres. En esa época, mi padre estaba viviendo en Puerto Rico, entonces en casa solo fueron nuestra madre y nosotros dos. Era difícil apoyarnos Como madre soltera. Ella trabajaba limpiando casas, pero no ganaba suficiente dinero. Por eso, tuvimos que trabajar desde que teníamos 7 años. Limpiábamos zapatos y vendíamos fruta en los semáforos. En esa época, no podíamos asistir a la escuela todos los días por que necesitábamos ayudar con la ganancia de la casa.

Yo era un estudiante bueno, pero Malvin no le gustaba la escuela. Él siempre ha tenido dificultades de aprendizaje. Por eso la escuela no le interesaba. Cuando éramos más mayores, nuestra madre no podía apoyarnos y nuestras hermanas menores, entonces tuvimos que salir de casa. Afortunadamente, mi madre encontró un internado católico en lo cual yo podía hospedarme y seguir con mi educación con las monjas. Pero el internado solo podía acomodar un solo niño más, entonces mi madre tuvo que hacer la decisión difícil de elegir cual hijo podría seguir con su educación. Como Malvin siempre tenía dificultades en la escuela, me escogió yo. Malvin fue a vivir con la madre de nuestro padre y tuvo que seguir trabajando.

Después del cuarto grado, Malvin no regresaba a la escuela. Él debería continuar con su educación lo mejor que podía, pero en realidad el no tenía supervisión suficiente. Prefería pasar el tiempo en que no estaba trabajando con sus amigos, los cuales no siempre fueron influencias positivas. Es importante decir que cuando era niño, Malvin tuvo varios accidentes en que sufrió golpes a la cabeza. Creo que él siempre ha sido influenciable y a veces no le da cuenta cuando alguien no tiene intenciones buenas. Desafortunadamente, él todavía tenía ese mismo problema cuando se hizo mayor.

Malvin siempre ha sido bien trabajador. La realidad es que muy difícil obtener un trabajo en este país sin saber leer o escribir muy bien. Pero él estaba tratando hacer lo mejor que podía. Trabajó como pintor para contratistas y también estaba empleado haciendo entregas de comida para una mujer con un negocio de cocina, pero estaba fatigada de faltar de empleo regular. Pienso que eso fuera la razón que Malvin hizo lo que hizo. No es una excusa, pero me parece que personas se aprovecharon de él porque no podía ver que no le importaban.

Cuando Malvin estaba bajo supervisión, estaba viviendo en la casa de la madre de su novia. Pero como él no podía seguir con su trabajo de entregas, ella se enojaba con él porque siempre estaba en casa y no ayudaba con los gastos de casa. A pesar de que él no fuera permitido, ella siempre estaba ordenándolo a salir de casa y trabajar. Era una situación muy dura y difícil para Malvin. Alguna vez ella le tiró una copa a él. Malvin me dijo una vez que preferiría vivir en la calle que allí. Yo le aconsejó a comunicar con su agente o su abogado, pero no sé si él lo hizo. Estaba bajo

mucha presión y estrés. Cuando se desapareció, nadie sabía donde estaba. Estábamos muy preocupados. Malvin reconoce que fue un gran error.

Mi hermano está muy arrepentido por los errores que ha cometido. Y cuando yo voy a visitarlo en la cárcel me dice que quiere pedir perdón que de ahora en adelante quiere ser otra persona en el futuro. Quiere trabajar y quiere echar pa'lante con su hijo. Yo trabajo en construcción. Hago pisos, plumería, carpintería, y más. Por años, he guardado dinero para empezar mi propio negocio de construcción. Tengo casi todas las herramientas que necesito, solo tengo que guardar un poco más para una camioneta. Me dice que cuando él salga, quiere trabajar conmigo. Si tengo un poco de suerte, ya tendré mi negocio cuando él esta liberado.

Malvin ha sufrido mucho en la vida y no ha buscado amistades correctas que lo llevan por un buen camino. Pero yo creo que este caso, y sobre todo este tiempo bajo preso, han sido revelador por él. Malvin nunca haría daño a nadie. Solo espero que le dé otra oportunidad. Gracias por su tiempo.

**Sinceramente,**
**Ismael Pereyra Restituyo**

# EXHIBIT D

Hon. Jed S. Rakoff
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Distinguished Judge,

My name is Ruth Pereyra Restituyo. I am writing this letter of support for my older brother, Malvin Pereyra Restituyo. I'm the younger sister, so I can't say too much about his own childhood. But from my few memories of that time, I am sure that Malvin was the same as he is today: a good brother and a person who does not lack respect for others.

Malvin gets along well with older people, with children, and with young people. If someone asks him for help with something, he does it well and without complaints. For example, when we were children there was a time when he took care of me and my other little brother because our parents had to go out to work and could not watch us during the day. That was when Malvin was 14 years old. Malvin has worked since he was a child in the Dominican Republic. Since he came here to the United States, he has had various jobs such as painting and delivery. I think Malvin has always had good intentions, but what happened was that bad people took advantage and my brother did not understand the consequences of aiding criminal behavior.

Yes, my brother has made mistakes, and his not following the rules of his supervision is one of them. He should not have done that, but he was not thinking clearly. It was because where he was living, he thought he could not be anymore because there were so many problems there. They were kicking him out of the house because he didn't contribute anything to the household. So, he left to the streets to sleep in the parks and under the tunnels because he was desperate and he was going through a very deep depression. I know that this is not a reason to break the law, but I ask that you keep his situation in mind when you impose the sentence. Malvin is very sorry for the harm he did, and he wants to be an admirable person in society. He wants to be with his child and give him an education that perhaps he did not know how to achieve himself. May God bless you.

Thank you. Sincerely,

Ruth Pereira Restituyo Lopez

Hon. Jed S. Rakoff
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Distinguido Juez,

Mi nombre es Ruth Pereyra Restituyo. Le escribo esta carta de apoyo para mi hermano mayor, Malvin Pereyra Restituyo. Soy la hermana menor, entonces no puedo decir demasiado de la juventud de él. Pero de mis pocas memorias de esa época, estoy seguro de que Malvin fue lo mismo que es hoy en día: un buen hermano y una persona que no le falte el respeto a los demás.

Malvin se lleva bien con la gente mayores, con los niños, y con los jóvenes. Si alguien le pide ayuda con algo, lo hace bien y sin quejas. Por ejemplo, cuando éramos niños hubo una época en que él me cuidaba a mí y a mi otro hermano pequeño porque nuestros padres se iban a trabajar y no podían atendernos durante del día. Eso era cuando Marvin tenía 14 años. Malvin ha trabajado desde niño en la República Dominicana. Después de venir aquí a los Estados Unidos, ha tenido varios trabajos como en la pintura y delivery.  Yo pienso que Malvin siempre haya tenido intenciones buenas, pero lo que pasara era que gente aviesa se aprovecharon de él y mi hermano no entendió las consecuencias de ayudar la conducta delincuente.

Sí, mi hermano ha cometido errores, de los cuales no seguir el procedimiento que él estaba sometido es uno. No debería haber hecho eso, pero él no estaba pensando claramente. Fue porque en donde él vivía él pensaba que no pudiera estar porque tenía muchos problemas. Le estaban echando de la casa porque él no aportaba nada. Entonces se fue a la calle a dormir en los parques y abajo de los túneles porque estaba desesperado y estaba pasando por una depresión muy profunda. Yo sé que esto no es un motivo para incumplir la ley, pero lo pido que tenga la situación de él en su mente cuando usted impone la sentencia. Malvin está muy arrepentido por el daño que hizo y quiere ser una persona admirable en la sociedad. Quiere estar con su niño y darle una educación que quizá él no la supo aprovechar. Qué Dios lo bendiga.

Gracias. Atentamente,
Ruth Pereira Restituyo Lopez